RECEIVED
NOV 2 9 2012
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| GREGORY A. COMEAUX, ET AL | : | DOCKET NO. 2:09-1696 |
| VS. | : | JUDGE TRIMBLE |
| STALLION OILFIELD CONSTRUCTION, ET AL | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court are two motions: (1) "Motion for Summary Judgment" (R. #27) filed by defendants, Stallion OilField Construction, LLC and Stallion Oilfield Services, Ltd (collectively referred to as "Stallion") and (2) "Motion for Summary Judgment by Defendant, Red Willow Offshore, LLC" (R. #24) wherein the movers seek a dismissal of all claims of plaintiffs, Gregory Comeaux, Tredale Boudreaux and Mary Mayeux, James A. Pearce, Jonas and Barbara Primeaux, Gaylin Richard, Karl and Jamie Styron, Francis Roman Theriot, Andy Vaughan, Terry and O'Sanna Vidrine, Ben and Michelle Welch, Yancy and Theresa Welch, Benny and Linda Welch. Defendants maintain that they at all times acted prudently and within industry standards and that Hurricane Ike constituted a classic case of "force majeure" preventing plaintiffs from any recovery against them and making summary judgment appropriate.

## FACTUAL STATEMENT

Plaintiffs in this case are property owners in Cameron Parish who suffered damage to their property as a result of Hurricane Ike in September 2008. Plaintiffs allege that oilfield mats that belonged to or were in the custody of Stallion and being used by Red Willow Offshore LLC ("Red

Willow") were moved by Hurricane Ike's storm surge. Plaintiffs allege that the mats struck their property causing significant damage.

Plaintiffs allege that after public advisories were issued by the National Hurricane Center, Stallion and Red Willow were negligent by failing to either secure the mats properly or relocate the stacks of oilfield mats. The oilfield mats were either under lease by Stallion to Red Willow during the relevant time period and/or were being stored at the Red Willow/J.C. Reina well site. Red Willow used some of the mats to gain access to the well site and as a pad for the Red Willow equipment. The mats are on average 12x8 feet and consist of three layers of wood or composite approximately 6 inches thick. Each mat weighs approximately 1200 to 1500 pounds.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[2] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[3] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[4] Once

---

[1] Fed. R.Civ. P. 56(c).

[2] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

[3] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).

[4] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).

2

the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[5] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[6] There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[7] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[8]

## LAW AND ANALYSIS

Stallion maintains that plaintiffs will not be able to satisfy their burden of proving that Stallion was negligent, and that plaintiffs will not be able to prove that the oilfield mats leased by Stallion to Red Willow caused the alleged damage to their property. Stallion also asserts the defense of "force majeure" or "Act of God."

Red Willow maintains that plaintiffs cannot prove (1) negligence, (2) that Red Willow owned and/or had control over the mats that caused the damage, (3) that the mats caused damage, and (4) Red Willow also asserts a "force majeure" and/or "Act of God" defense.

The court asked the parties to provide supplement briefs regarding the law with respect to the liability between a lessor and lessee concerning custody and control of the mats. Stallion reiterates that because it is the lessor, it did not have the authority to "dispossess" Red Willow of the mats and

---

[5] Anderson, 477 U.S. at 249.

[6] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[7] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

[8] Anderson, 477 U.S. at 249-50.

3

it could not unilaterally remove the mats without risking liability to Red Willow. Stallion argues that plaintiffs have failed to submit proof that anything could have been done to prevent the mats from moving in response to Hurricane Ike's ten foot storm surge.

Red Willow posits that a lease does not release an owner of all liability over the thing leased.[9] The Louisiana Supreme Court has recognized that "an owner of a thing who transfers its possession, but not its ownership to another, continues to have the 'garde' of its structure".[10] "The person who has the *garde* of a thing is he who has the legal duty to prevent its vice or defect from harming another...."[11] Thus, Red Willow avers that to be liable for damage caused by a thing and to have a duty under a negligence analysis, one must be the "owner or custodian" of the thing.[12] Red Willow argues that plaintiffs have to prove that Red Willow had "custody" or "garde" of the mats at issue. Red Willow maintains that plaintiffs have presented no evidence to establish that the mats in question came from the Red Willow site rather than some other well operator or oilfield service company. Red Willow remarks that the mats are not marked for identification and cannot be distinguished from one supplier and/or owner to the next. Red Willow posits that it can only be held liable for some independent act of negligence.

Plaintiffs maintain that there is a genuine issue of material fact as to whether or not the mats

---

[9] Citing Quintanilla v. Chateau Louisiane, Inc., 392 F.Supp.510, 515 (E.D. La. 1975)(where the court noted that a contract "between the lessor and lessee could have no effect on the issue of tort liability of the owner to third persons").

[10] Alford v. Home Ins. Co., 701 So.2d 1375, 1376-77 (La.App. 1 Cir. 11/7/97), writ denied, 709 So.2d 749 (La.1987).

[11] King v. Louviere, 543 So.2d 1327, 1328 (La.1989).

[12] La.Civ. Code Ann. Art. 2317 and 2317.1.

that caused the damage to their property were the same mats that were leased to Red Willow, or mats owned by Stallion that were being stored at the Red Willow well site. Plaintiffs also assert that there has been no proof that the additional mats being stored at the well site were being leased to Red Willow and/or were subject to the terms of the lease between Stallion and Red Willow.

*Negligence*

As to their negligence claim, Plaintiffs will be required to prove that : (1) each defendant had a duty to conform its conduct to a specific standard, (2) that conduct failed to conform to an appropriate standard, (3)the defendant's substandard conduct was a cause-in-fact of plaintiff's injuries, (4) defendant's substandard conduct was a legal cause of plaintiff's injuries, and (5) actual damages.[13]

Stallion asserts that the summary judgment evidence establishes that the oilfield mats were laid down in a manner consistent with the industry standard, and that Red Willow did not request that Stallion do anything to the oilfield mats in anticipation of the arrival of Hurricane Ike. Stallion maintains that it had no authority to do anything with the mats without Red Willow's permission citing McCurdy v. Bloom's Inc.,[14]   Stallion maintains that plaintiffs cannot offer any evidence that Stallion laid the oilfield mats incorrectly or in violation of any industry standard for laying oilfield mats in the marshes of south Louisiana.

Additionally, both Stallion and Red Willow assert the legal defense of "force majeure" or "Act of God" in that Hurricane Ike caused unexpected and unforeseen devastation with

---

[13] Long v. State, 619 So.2d 87, 101 (La. 6/29/05).

[14] 907 So.2d 896, 901 (La.App. 2nd Cir. 6/29/05)(Lessor is obliged to protect the lessee's peaceful possession for the duration of the lease).

unprecedented wind velocity, tidal rise and up river tidal surge.[15]  Stallion submits summary judgment evidence regarding the path Hurricane Ike took and the difficulty weather experts had forecasting the hurricane's projected landfall. Stallion asserts that the evidence establishes that it was not known until approximately 48 hours before the storm made landfall that there would be a significant storm surge along the Louisiana coast.

Plaintiffs have submitted summary judgment evidence to dispute defendants' assertion that they were not negligent, and to rebut the legal defense of "force majeure." Specifically, the evidence consists of hurricane forecasts which projected the well site to be in the path of Hurricane Ike 5 days before landfall and warnings of strong storm surge 58 hours before landfall. Hurricane Ike made landfall near Galveston Island on September 13, 2008.  On September 4, 2008, the National Hurricane Center categorized Hurricane Ike as a Category 4 hurricane with maximum winds of 125 knots and forecasted a sixty-seven percent chance of the hurricane making landfall in an area including Cameron, Louisiana, with Louisiana being roughly in the center of its projected path [16] Plaintiffs argue that even with these warnings, defendants admittedly did nothing to remove the stacks of mats or secure them before the hurricane's arrival.

Plaintiffs specifically inform the court that it is not alleging that Stallion was negligent in the manner in which it laid the mats on the road and around the well site, but that it was negligent in not removing or securing numerous stacks of mats that were being stored at the well site.

To prevail on a negligence claim of a thing's owner under Louisiana Civil Code article 2315,

---

[15] See Dollar Thrifty Auto Group, Inc. v. Bohn-DC, LLC, 23 So.3d 301, 304 (La.App. 5th Cir. 9/30/08).

[16] Plaintiffs' exhibit 16, p. 5.

a plaintiff must prove that "something about the thing created an unreasonable risk of injury that resulted in the damage, *that the owner knew or should have known of that risk,* and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing."[17] Plaintiffs argue that genuine issues of material fact exist as to the number of stacks of mats at the well site so as to create an unreasonable risk of damage to plaintiffs, and whether defendants had adequate time to take steps to prevent such damage.

Stallion and Red Willow contend that there were only 2 or 3 stacks of mats approximately 8 to 14 feet tall,[18] and that none of these stacks were budged by Hurricane Ike.[19] Defendants submit that plaintiffs cannot prove that the unmarked mats came from the Red Willow/J.C. Reina well site. Both Stallion and Red Willow assert that there were other contractors within a half mile radius of the site at issue that had laid board roads at different job sites.

To establish a genuine issue of material fact, several of the plaintiffs have provided sworn statements that they have lived in the immediate area of the well site, were familiar with the oilfield activity in the area, and that there was no other oilfield activity in the vicinity of the Red Willow/J.C. Reina well site or in the vicinity of plaintiffs' damaged property, particularly to the southeast of plaintiffs' property.[20] Plaintiffs submit summary judgment evidence that the mats that struck their property were from the Red Willow/J.C. Reina well site, and that the wind direction during Hurricane Ike was directly from the well site to plaintiffs' property.

---

[17] Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 (La.1982).

[18] Defendants' exhibit 1.

[19] Defendants' exhibit 1, p. 33.

[20] Plaintiffs' exhibits 3, 4, 5, 6, 9, 10, 15.

Plaintiffs claim that the mats came from a large number of approximately 25 foot high stacks of mats which were being stored by Stallion and/or Red Willow at the well site immediately before Hurricane Ike. Plaintiffs submit summary judgment evidence that there were many more stacks of mats stored immediately prior to the storm which were much higher than defendants allege.[21] Plaintiffs submit their own testimony that all of the stacks of mats were gone from the well site immediately after the storm, with the exception of 2 or 3 much shorter stacks, which they allege is consistent with the St. Clair photos[22] taken after the storm.[23] Plaintiffs submit summary judgment evidence that Hurricane Ike floated over 700 mats from the Red Willow/J.C. Reina well site.[24] Plaintiffs submit summary judgment evidence that Stallion billed Red Willow for over 700 hundred mats which Hurricane Ike removed from the Red Willow/J.C. well site.[25] Plaintiffs submit summary judgment evidence that the number of mats used to build the pad and board road to and around the well site, was approximately 700, and that after the storm, most of the board road and pad site were still intact.[26] In their sworn affidavits, several plaintiffs swear that they saw Stallion company trucks retrieving the mats on and around their property.[27] Thus, plaintiffs argue that this proves that the lost mats must have come from the stacks of stored mats as opposed to the mats leased to Red Willow

---

[21] Plaintiffs' exhibits 3,4,5,6,9,10, 15.

[22] Michael St. Clair was employed by Red Willow as the Production Superintendent.

[23] Plaintiffs' exhibits 3, 4, 5, 6, 9, 10,15.

[24] Plaintiffs' exhibit 1, p. 48; exhibit 2, pp. 49-50.

[25] Plaintiffs' exhibit 1, pp. 49-50.

[26] Plaintiffs' exhibits 1, 2, (pp. 80-81), 14, and 19.

[27] Plaintiffs' exhibits 4, 6, 13, and 15.

that were being used for the road and pad.

*Causation*

Plaintiffs maintain that they have offered solid evidence that the damage to their property was caused by defendants' mats from the Red Willow/J.C. Reina well site. Plaintiffs note that their property is situated northwest of the well site and consistent with the southeast wind direction of Hurricane Ike, a clear path of oilfield mats was distributed from the well site to Creole, Louisiana.[28] Plaintiffs note that their property is within this southeast to northwest path and that each of the plaintiffs discovered numerous oilfield mats on their property upon inspection for damage done by Hurricane Ike.[29] Plaintiffs submit that they discovered on their property, immediately after Hurricane Ike, oilfield mats which were inside, underneath, immediately adjacent to or tangled with their damaged property.

Plaintiffs submit that both Stallion and Red Willow knew and contemplated that the mats could be moved or floated by high water and hurricanes. Plaintiffs submit the agreement between Red Willow and Stallion which states "customer agrees any mats lost or damaged due to high water, hurricane,. . . . will be charged to the customer at $600.00 per mat."[30] Plaintiffs further submit that other oilfield companies made hurricane preparations in the days before the storm including securing loose equipment and materials and/or relocating such equipment and materials to an area outside the hurricane danger zone.[31]

---

[28] Plaintiffs' exhibit 3.

[29] Plaintiffs' exhibits 3-15.

[30] Plaintiffs' exhibit 18.

[31] Plaintiffs' exhibit 5.

Plaintiffs submit that their claims of negligence arise from defendant's failure to remove or secure numerous high stacks of mats, not the board road or pad site. Plaintiffs argue that there is a genuine issue of material fact as to the number of mats being stored at the well site as well as which mats floated and damaged plaintiff's property – the mats that were stacked and stored versus mats used for access to the well site and as a pad.

Defendants rely on the deposition of Allen Bourque,[32] who testified that practically the entire board road and pad site was removed by the storm and had to be replaced.[33] Plaintiffs submit the testimony of plaintiff Karl Styron who observed that after the storm, most of the board road was still intact.[34] Plaintiffs also submit a photograph which reveals that most of the pad site location was still intact after the storm.[35]

As to the cause of the alleged damage, plaintiffs argue that there is genuine issue of material facts as to the source of the mats which damaged plaintiffs' property. Furthermore, plaintiffs assert that they have submitted summary judgment evidence that there were over 100, 1200-1500 pound mats found on their property after Hurricane Rita made landfall. Plaintiffs have also submitted the report of a professional property damage adjuster who estimated only damage caused by mats and confirmed damage was caused to each of the plaintiffs' property by the mats. Plaintiffs have submitted their own affidavits with respect to their observations pre and post Ike as follows:

---

[32] Mr. Bourque was the foreman on the Mud Island site where Stallion was laying the mats for the road and drill site for Red Willow.

[33] Plaintiffs' exhibit 4, pp. 54-55.

[34] Plaintiff's exhibit 14, 19.

[35] Plaintiff's exhibit 1.

*Andy Vaughan affidavit*[36]

Mr. Vaughan testifies that he lives less than one mile northwest of the well site and he could see stacks of oilfield mats at the Red Willow/J.C. Reina well site in the week prior to Hurricane Ike. He also observed loads of mats being transferred from a nearby oilfield production site to the Red Willow/J.C. Reina site for storage the week before the hurricane.

Mr. Vaughan viewed the photographs attached to Michael St. Clair's deposition ("St. Clair photos"), Red Willow's corporate representative, which show two or three stacks of oil field mats after Hurricane Ike. Mr. Vaughan testifies that there were "many, many, many more stacks of oilfield mats and much higher stacks of oilfield mats" at the well site within one week prior to the hurricane making landfall.

Mr. Vaughan testifies that he observed oilfield activities within a several mile radius of his home the week before the hurricane and he was unaware of any oilfield locations other than the Red Willow/J.C. Reina site where oilfield mats were utilized or stored in the week immediately before the hurricane.

Mr. Vaughan purposefully looked for the oilfield mats at the Red Willow well site to determine the origin of the numerous oilfield mats which were deposited on his property by Hurricane Ike. Almost all of the stacks which had been on the well site before the storm were gone with the exception of two or three much shorter stacks of mats which were barely visible across from the marsh from Mr. Vaughan's property after the storm.

Also after the storm, Mr. Vaughan rode in an air boat from his home to Creole and observed a clear path of oilfield mats from the Red Willow/J.C. Reina well site to Creole, Louisiana. He also

---

[36] Plaintiffs' exhibit 3.

observed oilfields mats inside his barn which was damaged during the hurricane.

*Ben Welch affidavit*[37]

Mr. Welch lives about two miles northwest of the well site. In the week prior to the hurricane, Mr. Welch observed stacks of oilfield mats being stored at the well site. Mr. Welch observed loads of mats being transferred from an oilfield production site to the Red Willow/J.C. Reina well site for storage.

Mr. Welch viewed the St. Clair photos and testified that there were "many, many, many more stacks of oilfield mats and taller stacks of oilfield mats at the well site prior to the hurricane" than were depicted in the photograph taken after the storm.

Mr. Welch flew over the Red Willow/J.C. Reina well site and surrounding property and observed hundreds of oilfield mats scattered throughout the marsh on J.C. Reina's property north of the Red Willow well site and in the immediate vicinity of the well site.

Mr. Welch testifies that he is unaware of any oilfield sites other than the Red Willow site which were utilizing and/or storing oilfield mats in the week prior to the Hurricane. He also testifies that he observed Stallion company trucks transporting oilfield mats from a location north of Highway 82 and storing those mats on the Red Willow site prior to the hurricane making landfall. He further testified that all mats had been removed from the oilfield location north of Highway 82 before Hurricane Ike.

Mr. Welch testifies that 18 oilfield mats were deposited on his property by Hurricane Ike. He owns a mobile home which prior to Hurricane Ike was elevated five to six feet off of the ground by cinder block pilings. The lowest elevation of his home was higher than the highest level of the storm

---

[37] Plaintiffs' exhibit 4.

surge during the hurricane. Mr. Welch's mobile home was knocked off its pilings by the oilfield mats during the hurricane. Mr. Welch found the mats under his mobile home and up against the pilings after the storm. Mr. Welch's fence was also damaged; he found mats wrapped up in the fence after the storm.

Mr. Welch's bunkhouse was destroyed by the oilfield mats; he found material from the wall of the bunk house intertwined in an oilfield mat.

*Gaylin Richard affidavit*[38]

Ms. Richard lives less than one mile northwest of the Red Willow/J.C. Reina well site. She testifies that she could see stacks of oilfield mats at the well site in the week prior to Hurricane Ike. Ms. Richard testifies that she observed loads of mats being transferred from an oilfield production site north of Highway 82 to the Red Willow site for storage in the weeks immediately prior to Hurricane Ike.

Ms. Richard also viewed the St. Clair photos. Ms. Richard testifies that one week prior to Hurricane Ike, she observed many more stacks of oilfield mats and much higher stacks of oilfield mats at the well site than what was depicted in the photos after the hurricane. After the storm, Ms. Richard purposefully looked for the oilfield mats at the Red Willow well site to determine the origin of the numerous mats deposited on her property by Hurricane Ike. She observed that almost all of the stacks that had been on the well site before the storm were gone with the exception of two or three much shorter stacks of mats barely visible across the marsh from her property after the storm.

Ms. Richard observed the oilfield activities around her home the week prior to the storm and was unaware of any oilfield location other than the Red Willow site where oilfield mats were utilized

---

[38] Plaintiffs' exhibit 5.

13

or stored in the week immediately before Hurricane Ike. She also observed several oilfield companies other than Red Willow making hurricane preparations in the days before the storm, including securing loose equipment and materials and transporting such equipment and materials to a location more distant from the coast than Cameron, Louisiana.

Ms. Richard testifies that Hurricane Ike deposited 27 oilfield mats on her property and that the mats knocked her mobile home off its brick pilings during the hurricane. She testifies that because the lowest level of her mobile home was higher than the highest level of the storm surge, her home would not have been damaged if it had not been knocked off the pilings by the mats.

*Benny Welch affidavit*[39]

Mr. Welch lives about two miles northwest of the Red Willow well site and can clearly see the well site from his property. Prior to the storm, Mr. Welch observed many stacks of oilfield mats at the site which were about 25 feet tall. He further noticed that nearly all of the stacks of mats disappeared from the well site immediately following the hurricane leaving only a few shorter stacks.

Mr. Welch viewed the St. Clair photos and testifies that there were many more stacks and taller stacks of oilfield mats at the well site before the storm. He is familiar with the oilfield activity within a several mile radius of his home and is unaware of any oilfield sites other than the Red Willow site which were utilizing and/or storing oilfield mats in the week prior to Hurricane Ike.

Mr. Welch observed Stallion company trucks transporting oilfield mats from a location north of Highway 82 and storing those mats on the Red Willow well site within a few weeks before Hurricane Ike. Mr. Welch sustained damage to his house, pool, fence and barn and found oilfield mats in the immediate area after the storm.

---

[39] Plaintiffs' exhibit 6.

*Jonas Primeaux affidavit*[40]

Mr. Primeaux lives in Creole, Louisiana. He testifies that Hurricane Ike deposited 7 oilfield mats on his property. Mr. Primeaux called and spoke to an employee of Stallion who informed him that Stallion would pick up the oilfield mats from his property. Shortly after the conversation, the mats were removed from Mr. Primeaux's property. Mr. Primeaux testifies that the mats struck the south side of his home causing damage and that the mats settled just a few feet from the damaged area of his home.

*O'sanna Vidrine*

Ms. Vidrine lives approximately two miles northwest of the Red Willow well site in a mobile home. She testifies that the bottom elevation of her home before the storm was higher than the highest level of the storm surge. She further testifies that oilfield mats knocked the blocks out from under one side of her home and that it would not have sustained any damage if it had not been knocked off its blocks by the mats. Ms. Vidrine testifies that either seven or eight mats were deposited onto her property and were found pushed up against her home after the hurricane and that three mats were found within 30 feet of the mobile home. She further observed that there were no other large objects found on or in the immediate vicinity of her property which could have knocked the mobile home off its blocks.

*Francis Roman Theriot*[41]

Mr. Theriot lives two miles north-northwest of the Red Willow well site. He passed in front of the well site at least once during the week prior to the hurricane. Mr. Theriot observed the well

---

[40] Plaintiffs' exhibit 7.

[41] Plaintiffs' exhibit 9.

15

site before the hurricane and saw a number of stacks of oilfield mats prior to the storm. He also viewed the St. Clair photos and testifies that there were several more stacks at the well site prior to the storm than were depicted in the photos after the storm. Mr. Theriot also was unaware of any other oilfield locations where oilfield mats were utilized or stored in the week prior to Hurricane Ike.

Mr. Theriot testifies that the damage to his barn was caused by an oilfield mat which struck the outer wall of his barn and carried the awning of the barn over the top of a nearby fence. The mat and awning came to rest within 100 yards of the barn and another mat was found after the storm tangled in a barbed wire fence near the barn.

*Tredale Boudreaux affidavit*[42]

Ms. Boudreaux lives approximately two miles north-northwest of the Red Willow well site. Ms. Boudreaux testifies that she observed a large number of stacks of oilfield mats on the Red Willow well site within one week before the storm. Ms. Boudreaux viewed the St. Clair photos and testifies that there were several more stacks of oilfield mats at the drill site one week before the storm than are shown in the St. Clair photos. Ms. Boudreaux further testifies that she is unaware of any other oilfield locations in the area where oilfield mats were being used or stored.

Ms. Boudreaux testifies that the damage to her barn was caused by an oilfield mat which struck the outer wall of the barn and another mat was found after the storm tangled in a second barbed wire fence near the barn. Ms. Boudreaux also found an oilfield mat hung up on a water spigot attached to her barn.

---

[42] Plaintiffs' exhibit 10.

*Gregory Comeaux affidavit*[43]

Mr. Comeaux testifies that he sustained damage to his house and cattle pen. His home was elevated on cinder blocks, the lowest elevation was higher than the highest level of the storm surge during Hurricane Ike. Mr. Comeaux testifies that his home would not have sustained damage had it not been for the mats knocking his home off the blocks; the house was carried off into the marsh.

Mr. Comeaux observed several oilfield mats surrounding his house in the marsh; some were butted immediately up against the house. He did not observe any other large objects in the vicinity which could have knocked the house off its blocks. He also found several oilfield mats up against damaged portions of his cattle pen and in his cattle pen. Mr. Comeaux found about twenty mats on his property after Hurricane Ike and he observed many, many more mats immediately around his property after the storm.

*James Pearce affidavit*[44]

Mr. Pearce testifies that he lives in a mobile home approximately two miles northwest of the Red Willow well site and that his mobile home sustained damage when it was knocked off its cinder block pilings by oilfield mats during Hurricane Ike. He states that there were several oilfield mats in the immediate vicinity of the damage after the storm.

*Charles Mayeux affidavit*[45]

Mr. Mayeux states that he owns property approximately two miles from the Red Willow well site and that his property was damaged by oilfield mats during Hurricane Ike. He found nine mats

---

[43] Plaintiffs' exhibit 11.

[44] Plaintiffs' exhibit 12.

[45] Plaintiffs' exhibit 13.

on his property after the storm. He testifies that he had a storage shed and two utility houses damaged by large heavy objects which he believes were the oilfield mats because they were found in the immediate vicinity of the damage to his property.

Mr. Mayeux observed Stallion employees in a Stallion truck picking up approximately four mats from his property immediately after Hurricane Ike.

*Karl Styron affidavit*[46]

Mr. Styron lives in Creole, Louisiana about five to six miles from the Red Willow well site and he states he frequently traveled down Highway 82 both before and after the storm. Mr. Styron observed the board run leading to the well site after the storm and observed that a few oilfield mats had been torn up and removed by the storm, but most of the board road was still intact.

Mr. Styron sustained damage to the walls of his home, columns on his home and to his pool and the interior of his workshop. He found 13 or 14 of the mats which were deposited on his property by Hurricane Ike. He found four mats in his swimming pool and he testifies that the damage to his property was localized and in very specific areas which were caused by the impact of the mats.

*Yancy Welch affidavit*[47]

Mr. Welch lives about two miles northwest of the Red Willow well site. He states that he could clearly see stacks of oilfield mats at the well site in the week prior to Hurricane Ike. He also observed loads of mats being transferred from a Red Willow production site north of Highway 82 to the Red Willow well site south of Highway 82 in the weeks immediately before the storm; those mats were stored in stacks at the Red Willow well site.

---

[46] Plaintiffs' exhibit 14.

[47] Plaintiffs' exhibit 15.

Mr. Welch viewed the St. Clair photos and states that there were many more stacks of oilfield mats prior to the storm than are depicted in the photos taken after the storm. Mr. Welch further states that he is unaware of any other oilfield activities within a several mile radius of his home the week before the storm.

Mr. Welch attests that the damages to his barn, swimming pool and home were caused by oilfield mats, and that over 20 oilfield mats were deposited on his property. He testifies that it was easy to determine the path the mats took and the damaged caused by the mats. Mr. Welch observed Stallion trucks picking up the mats on several occasions in the area of his home in the weeks after Hurricane Ike. He found over 20 mats on his property after the storm. He observed many other mobile homes in the area that were elevated on cinder blocks that did not get knocked over by the storm.

The court finds that plaintiffs have presented sufficient summary judgment evidence to establish that there is a genuine issue of material fact for trial as to (1) who had custody and control of the mats, (2) whether either Stallion or Red Willow were negligent in not removing the mats or not securing the mats prior to the storm, and (3) whether or not the mats caused the alleged damage to plaintiffs' property.

The court has closely examined all the evidence presented by the parties. There are some plaintiffs whose affidavits provide the court with direct evidence of the mats being implicated in the damage. Rather than render judgment against some plaintiffs, reserving the right to trial, the court will deny summary judgment as to all plaintiffs and permit all plaintiffs to proceed to trial on the scheduled trial date. This will not preclude the motions of defendants during and after the trial, but it will insure a full trial and a complete record to be considered on appeal by any party aggrieved by

the jury verdict and/or any ruling by the court.

*Force majeure defense*

As to defendants' "force majeure" or "Act of God" defense, plaintiffs maintain that this argument itself presents a question of fact because defendants will have to prove that Hurricane Ike's impact on the stacks of mats at its well site could not have been foreseen and the effects could not have been avoided by the exercise of reasonable prudence, diligence and care.[48] Plaintiffs submit that defendants had at least 4 days to either secure the mats or move them; plaintiffs submit that several other oil companies took measures to either secure or move various equipment and material in the area before Hurricane Ike made landfall. Thus, plaintiffs maintain that there are genuine issues of material fact as to defendants' "Act of God" defense. The court agrees and finds that there is a genuine issue of material fact for trial with respect to both defendants' "Act of God" defense.

## CONCLUSION

Based on the foregoing, the motions for summary judgment filed by both Stallion and Red Willow will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 29th day of November, 2012.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

---

[48] Dollar Thrifty Auto Group, Inc., 23 So.2d at 304.